Filed 9/23/25  In re Sheila M. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re Sheila M., a Person Coming Under the Juvenile Court Law. | B337772 |
| ———————————————— LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 23CCJP04267A |
| Plaintiff and Appellant, | |
| STELLA E., | |
| Objector and Appellant, | |
| v. | |
| CHARLES M., | |
| Defendant and Respondent. | |

APPEAL from findings and order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Juvenile Court Referee.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Objector and Appellant.

Dawyn Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Appellant.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Respondent.

## INTRODUCTION

Mother and the Los Angeles County Department of Children and Family Services (DCFS) appeal from the juvenile court's jurisdictional findings and order as to the minor child. Mother and DCFS contend the juvenile court should have sustained the petition as originally pleaded. More specifically, they argue the juvenile court's amended language of count b-1 and dismissal of count d-1 was error as Father's actions constitute sexual abuse under Welfare and Institutions Code[1] section 300, subdivision (d). Father disagrees and argues the trial court's decision to amend count b-1 and dismiss count d-1 "was an appropriate exercise of its fact-finding authority and must be sustained."

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   *Referral and Investigation*

On November 3, 2023, DCFS received a 5-day referral alleging sexual abuse of 14-year-old Ryan.[2] Per the reporting

---

[1]   Undesignated statutory references are to the Welfare and Institutions Code.

[2]   Ryan's birth name is Sheila M. Ryan uses he/him/his pronouns.

2

party, Ryan disclosed that "the trigger" leading to his hospitalization was an incident where he felt Father's erect penis after Father climbed on top of him.

On November 9, 2023, a DCFS children's social worker (CSW) arrived at Mother's home and interviewed Mother and Ryan. Mother recounted that while she and Ryan were at Ryan's doctor's office for a check-up on October 30, 2023, she noticed Ryan hesitate in answering a question about "being touched inappropriately" on the routine medical paperwork and questionnaire he was completing. Mother asked Ryan about it and Ryan confided in her that there have been incidents where Father "laid on top of him and wouldn't get off" while Ryan was laying on the bed or couch, making Ryan feel "gross" and "uncomfortable." Ryan said he felt Father's erect penis and that Father had "grab[bed] his hip hard" on prior occasions. During this disclosure, Ryan avoided Mother's eye contact and kept apologizing as if "it was his fault."

Ryan then discussed the incidents with his doctor, Kaiser's social worker, and the school counselor. Per Mother, "after Ryan spoke to everyone, it brought up a lot of emotion and Ryan came to her on 11/1/23 about thoughts of suicide," leading to his hospitalization from November 1 through 7, 2023.[3]

---

[3] This was Ryan's third hospitalization. He was first hospitalized after Thanksgiving 2022 because he "fe[lt] like he can't do anything right." His second hospitalization was in February/March 2023 because he was "bullied for having red hair."

Mother stated Father's visits with Ryan were "sporadic"— "maybe twice a month."[4]  Father provides $400 a month in child support "but does not help with anything else."  Mother has not spoken with Father since discovering this information and blocked his phone number on Ryan's cell.

Ryan told the CSW he "doesn't want [Father] to go to jail." Ryan "does not feel safe with dad" and is "scared" of him because Father always yells at him.  Ryan has been diagnosed with major depressive disorder, anxiety, ADHD, and gender dysphoria.

B.    *Forensic Interview*

On November 21, 2023, Ryan's forensic interview was conducted at the Children's Advocacy Center.

When the forensic interviewer asked Ryan, "tell me everything about your dad," Ryan's first shared piece of information was that Father cheated on Mother while Mother was pregnant with Ryan.  He next shared that Father "yelled at [Ryan] every day . . . for nearly eight years of [his] life."  Ryan said he "was scared" of Father and, at times, thought Father "was gonna hurt [him] or something."

The forensic interviewer asked Ryan to explain what he previously reported to the CSW.

Ryan described the first instance, which happened when he was 13 years old.  He stated that sometime during the previous year (2022), while he was laying down on his stomach on the living room couch in Father's home, with Father sitting across from him on a chair, Ryan and Father "were like joking around

---

[4]    Mother reported that she and Father were in a relationship at the time Ryan was conceived; they have not been together since the year 2020.

and then he like, just got up suddenly and then he . . . laid on top of me . . . .  And he wouldn't get up, even when I told him to [*sic*].  Not just that, . . . Dad's a pretty big guy so I like couldn't breathe with him on top of me. . . . I felt like I was gonna pass out."  Father's stomach was on Ryan's back, and Father had his legs "spread over" Ryan's legs.  Ryan at first started "awkward[ly] laughing" and then "was telling him to get off" but he did not.  When asked whether Father said anything in response, Ryan said, "I don't really remember what he said.  He either said no or he was just like laughing."  After about two minutes of Father "just laying still on" Ryan, Father "finally" got off and went outside to the porch area to smoke.

The forensic interviewer asked more questions about the first instance, and Ryan provided the following information: Ryan felt "something was poking" him "right below [his] butt" and heard Father breathing "really heavily" and "shaky."  The interviewer clarified, "Ok, just breathing heavily, he's on top of you, and you said you could feel it.  And you said that he wasn't moving.  So he's just laying on top of you, right?"  Ryan replied, "I think his legs were moving."  "Like a little bit" and were "shift[ing] around."

Ryan described the second instance: Sometime in December 2022 or January 2023, Father "did it again except I was on my back in the bedroom, and he got on top of me with, I had my legs open . . . and he like laid on top of me . . . and he wouldn't get off when I told him to [*sic*]."  Ryan didn't "know if it was just [Father's] pants or something 'cause he had jeans on . . . but there was like something poking me."  After "a while," Father got up because Ryan was "gasping for air 'cause [he] couldn't

breathe." Father "just like left the room" and Ryan did not see him for "another hour."

The forensic interviewer asked clarifying questions about the second instance. Ryan said he was 14 years old during the second incident and that it took place "definitely right after Spring." While he was sprawled out on the bed, he was "messing" around with Father and "being annoying as a child does," and Father got up from his chair, walked over, and "plopped on top" of Ryan. Ryan's face was in Father's shoulder and neck area, and Father's legs were in between Ryan's legs. The interviewer asked what Father did on top of Ryan, and Ryan answered, "He didn't really do anything." A few minutes later, when asked what Father's legs were doing, Ryan answered, "they were moving more than the last time" and "were just like shifting around a lot." Ryan felt "something . . . really hard [¶] . . . [¶] . . . like a really heavy water bottle" pressed against Ryan's pelvic area. Father stopped when "either Grandma called him . . . or he had to go to the restroom"—Ryan didn't remember which it was. Ryan "felt really gross" and "wrapped [himself] in a blanket."

When asked whether there were any incidents other than the two described, Ryan stated, "I think its actually happened a few more times but, I don't really remember if I like imagined that . . . or something. And he used to always like put his hand on my thighs [pats upper thigh near pelvic area]. Not just like right here [puts hand on leg], that's just like a pat, he was just like right here [puts hand higher on thighs]." When Ryan first turned 14, Father "started making more inappropriate jokes around me" and made Ryan feel "really uncomfortable [because] you're my dad, you shouldn't be talking about this girl stuff with me. It's something Mom should be talking about, not you."

6

C.    *Continued Investigation*

On November 22, 2023, the CSW received a call from a therapist from Aurora Charter Oak, Victor Peraza, who said this was his first interaction with this family. Mr. Peraza said Ryan was "hospitalized for endangerment to themselves" and that the "trigger was due to the father." To Mr. Peraza's understanding, "it may have been from playing around but rose to concern when Ryan felt an erection."

On December 4, 2023, the CSW interviewed Father at his home. Father said his method of discipline "used to be to spank, but he hasn't spanked since Ryan was four or five years old . . . now he tries not to yell and calmly talks to Ryan." Father is unsure whether Ryan has been medically diagnosed with anything but knows Ryan "has gender dysphoria" and "had a difficult time for the past couple years regarding [M]other and [F]ather's separation." Father knew Ryan was hospitalized last year and this year "for wanting to harm himself."

The CSW asked Father about the reported sexual abuse allegations of Father laying on top of Ryan with an erection. Father said "nothing like that ever happened" and that he did "not recall anything like that at all." Father said he was "abused as a child" by his own father and that he would "never do anything like that to his child." The CSW asked about Father having grabbed Ryan around the upper thigh area. Father said Ryan "is ticklish in that area" and that he would "tickle Ryan when goofing but not grab." Father told the CSW he "finds it interesting these allegations are coming up now" when there is a pending child support matter.

7

On December 6, 2023, Mother told the CSW Ryan is attending group therapy twice a week and meeting with his therapist every other week and his psychiatrist once a month.

D.    ***Petition and Detention***

On December 12, 2023, DCFS filed a section 300 petition on 14-year-old Ryan's behalf. It alleged:

- Counts b-1, d-1: Father "sexually abused" the child on prior occasions. In 2022, Father's "legs and hips were moving while [he] laid on top of the child, causing [Father's] penis to poke below the child's buttocks, causing the child difficulty breathing." In 2023, Father "laid on top of the child, causing the child's face to be in [Father's] shoulder and neck area. [Father's] legs were in between the child's legs, resulting in [Father's] body pressing on the child's vagina. The child had difficulty breathing." On prior occasions, Father placed his hands on the child's thighs. The child "felt uncomfortable" due to Father's conduct. "Such sexual abuse of the child by [Father] endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, danger, and sexual abuse."

At the December 27, 2023 detention hearing, the juvenile court found a prima facie case exists and that "continuance in the home of Father is contrary to the child's welfare." The juvenile court ordered Ryan detained from Father and released to Mother's home and care. Mother was deemed "non-offending." Minor's counsel informed the court that Ryan "shared he was not ready to have visits with Father" and discussed whether he "would have the right to decline" visits. The court ordered no

8

visitation for Father for three weeks as a "cooling off period." Father may then have monitored visits with Ryan, once a week for one hour. The court stressed that Ryan "is not to be forced to attend visits"; the court "certainly d[id]n't want to create trauma for . . . Ryan." DCFS was ordered to document if Ryan did not wish to participate in visits.

### E.     *Developments during Dependency Proceedings*

On January 10, 2024, DCFS interviewed Ryan, who "did not wish to discuss the details of the allegations." DCFS summarized the allegations and Ryan confirmed the allegations were "correct and true" as summarized. Ryan said, "Who does that to their daughter? Why would you get on her anyway?" Ryan expressed he is not interested in reunifying with or seeing Father. He stated that Father is "kind of a dick. He gaslights me a lot. He treats me like I'm stupid. He does that to my mom too. . . . I just don't like him. He convinced me for a while that he was a good guy, until last year. That is when I stopped liking him. It was the day mom told me that he [had] cheated on her. I started thinking everything over and I realized he's not a nice guy." Ryan was asked if he came to this realization before or after the sexual abuse occurred. Ryan answered, "On[e] incident was before, the other was after."

On January 25, 2024, the juvenile court ordered the production of the DVD of Ryan's November 21, 2023, forensic interview.

### F.     *Adjudication*

The jurisdictional and dispositional hearing took place March 28, 2024. Mother and DCFS both requested that the court sustain the petition as pleaded. Father requested that the

9

petition be dismissed in its entirety or, in the alternative, dismiss count d-1 and sustain an amended count b-1.

After hearing argument, the juvenile court made lengthy findings: "I recognize the standard is a preponderance of the evidence and I think it is very important to consider all of the factors and the people involved and the statements that were made by Ryan. Ryan, through the forensic interview, comes across as a child very bonded and devoted to his Mother and internalizes a lot of the mother's emotions and feelings with regards to the father."

The court did "not believe that Ryan made things up. Ryan's demeanor during the forensic interview became very emotional and his voice dropped to almost a whisper when he was expressing the two incidents that he alleges occurred between him and the father and acknowledges that there was an incident that occurred when the two of them—meaning the father and Ryan—were joking around, and that Dad suddenly got on top of Ryan and wouldn't get off. And then there was another incident again in December and Ryan was laying on his back and there is a description of the father getting on top of Ryan and how Ryan believed he was overreacting because it was his dad. And there was a lot of discussion by Ryan about Mom being [a] very sweet person and Dad being a person who yells and is tough and is a big person and that that is what made Ryan not be able to breathe, and the inappropriate jokes."

The court "can't help but think that part of the interaction between the father and Ryan has something to do with Ryan's gender dysphoria and that some of the relationship started to change when that became evident. And . . . there is a definite possibility—that the father may have made jokes or made

10

comments that appeared inappropriate to Ryan but that perhaps a father wouldn't think is inappropriate to say to a son, even though—I'm not trying to reach for anything, but I'm trying to understand the relationship and the dynamics with the family— and that could be definitely taking things too far. I don't think it is appropriate to make inappropriate jokes or sexual comments depending on the child's gender."

The court continued: "What I cannot believe, even by a preponderance of the evidence, is that any of the behaviors that Ryan attributes to the father were done for sexual gratification such that the elements in . . . Penal Code section 11165.1 [are met]. I don't think that even the description of the potential erection that was discussed even meets that level, and I think that, if anything, the court can sustain a b-1 count with relation to sexual boundaries being crossed and that it was inappropriate behavior. And I think a lot of it stems from the gender dysphoria and lack of knowledge and information, and I think that the intensely emotional experience that Ryan has undergone because of the custody disputes and all of it has sort of blended together, and so I think that Ryan was credible but I think that it is a reach to sustain a 'D' [count] in this case." With regards to count b-1, the court found Father's conduct was not sexual abuse but rather "crossed sexual boundaries and resulted in inappropriate contact" with Ryan.

The court dismissed count d-1 and amended count b-1 of the section 300 petition by interlineation:

- Count b-1: On prior occasions, Father "crossed appropriate sexual boundaries which caused the child to have difficulty breathing and to feel uncomfortable." On a prior occasion in 2023, Father "laid on top of the child

11

and placed [his] hands on the child's thighs, causing the child's face to be in [Father's] shoulder and neck area. Such conduct . . . caused the child to feel uncomfortable, placing the child at risk of serious physical harm and damage."

The juvenile court proceeded to disposition and found clear and convincing evidence of a substantial risk of detriment to Ryan's safety, protection, and physical and emotional well-being without his removal from Father's home and care. The court ordered Ryan released to home of Mother and ordered monitored visitation for Father, one hour once a week, to take place in a therapeutic setting. DCFS was given discretion to liberalize.

The court-ordered case plan for Father included parenting classes, sex abuse awareness counseling,[5] conjoint counseling with Ryan when appropriate, and individual counseling to address case issues including sexual abuse, co-parenting, and Father's "relationship with Ryan as it relates to child's gender dysphoria." Mother was ordered not to discuss with Ryan any interpersonal issues she has with Father.

Mother and DCFS filed notices of appeal.

---

[5] The court explained: "I'm not ordering sex abuse for perpetrators [counseling], but I'm ordering sex abuse awareness counseling because I believe that the father needs to understand the appropriate sexual boundaries."

G.    ***Post-Disposition Events***[6]

On March 27, 2025, while Mother's appeal was pending, the juvenile court found the conditions that justified the initial assumption of dependency jurisdiction no longer exist and are not likely to exist if supervision is withdrawn.  The court terminated jurisdiction with a custody order awarding Mother and Father joint legal custody and awarding Mother sole physical custody of Ryan.  The juvenile court stayed the termination of jurisdiction pending its receipt of the custody order on April 7, 2025.

## DISCUSSION

Mother and DCFS argue on appeal that the juvenile court should have sustained the section 300 petition as originally pleaded.  They contend Father's actions qualify as sexual abuse and fall within conduct described by section 300, subdivision (d).  Father disagrees and argues the juvenile court's "orders dismissing the (d) allegations and amending the (b) allegations must be upheld under the general principles of appellate review of substantiality of the evidence."

---

[6]    We grant Father's request for judicial notice filed March 28, 2025 as to exhibit B only—the minute order dated March 27, 2025.  (Evid. Code, § 452, subds. (c), (d).)

We also grant Mother's request for judicial notice filed April 14, 2025 as to attachments A, B, and C—i.e., the minute order issued April 7, 2025, the custody exit orders filed April 7, 2025, and Mother's notice of appeal filed April 7, 2025.  (Evid. Code, § 452, subds. (c), (d).)

13

In light of the juvenile court's subsequent order terminating jurisdiction on March 27, 2025, pending receipt of its custody exit orders issued April 7, 2025, Father argues this appeal should be dismissed as moot. He contends "[no] relief can be afforded to appellants" because "[r]einstating the subdivision (d) allegations will not change" anything since Ryan "is no longer subject to the jurisdiction of the Juvenile Court." Mother urges us to address the appeal because the juvenile court's findings and orders have "infected the outcome of subsequent proceedings," which Mother has appealed from via her notice of appeal filed April 7, 2025.

We address these contentions below.

## A. *Mother's and DCFS's Pending Appeal is Justiciable*

### 1. Applicable Law

"As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) " '[A]n appeal presenting only abstract or academic questions is subject to dismissal as moot.' " (*In re Jody R.* (1990) 218 Cal.App.3d 1615, 1621.) An important requirement for justiciability is the availability of effective relief. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1489.)

A reviewing court may nonetheless exercise its discretion to reach the merits of the parent's arguments when "(1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.)

14

"We decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether our decision would affect the outcome in a subsequent proceeding." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1404; see *In re Kristin B.* (1986) 187 Cal.App.3d 596, 605.)

2.     Analysis

When Father filed his respondent's brief on March 28, 2025 arguing that the appeal should be dismissed as moot as a result of the juvenile court's March 27, 2025 order terminating jurisdiction, Mother had not yet filed her notice of appeal. Mother waited until the juvenile court's April 7, 2025 issuance of custody exit orders; in fact, she filed her notice of appeal that same date. This supports Mother's argument on appeal that the juvenile court's findings and order further prejudice her with respect to subsequent custody orders pertaining Ryan—orders she has since appealed.

We consider the merits of Mother's appeal. Ryan will remain a minor until January 20, 2027; it is possible there may be future actions regarding him, either in the family law context or the dependency context (besides Mother's other pending appeal), until he reaches the age of majority. It is also plausible Father or the family law court may rely on the juvenile court's findings in making future, modified custody or visitation orders; thus, prejudice in subsequent family law proceedings is possible, rendering Mother's appeal justiciable.

15

B.  ***Substantial Evidence Supports the Juvenile Court's Jurisdictional Findings***

1.  Standard of Review

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and related dispositional orders, we "consider the entire record to determine whether substantial evidence supports the juvenile court's findings." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) In making our determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations and we note that issues of fact and credibility are within the province of the trial court. (*In re I.J.*, at p. 773.) " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid.*) We uphold the juvenile court's findings unless they are " ' "so lacking in evidentiary support as to render them unreasonable." ' " (*Jamieson v. City Council of the City of Carpinteria* (2012) 204 Cal.App.4th 755, 763.)

2.  Applicable Law

Under section 300, subdivision (b)(1), a juvenile court may assert jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of . . . [¶] (A) The failure or inability of

16

the child's parent . . . to adequately supervise or protect the child."  (§ 300, subd. (b)(1).)

Additionally, a juvenile court may assert jurisdiction over a child under section 300, subdivision (d), if the child "has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent."  (§ 300, subd. (d).)  Penal Code section 11165.1, in turn, defines "sexual abuse" as "sexual assault or sexual exploitation" and includes any act that violates Penal Code section 288 (lewd or lascivious acts upon a child under the age of 14) or Penal Code section 647.6 (annoying or molesting a child).  (Pen. Code, § 11165.1, subd. (a).)

Penal Code section 288 bars "any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." (Pen. Code, § 288, subd. (a).)  Penal Code section 288 "is violated by 'any touching' of an underage child accomplished with the intent of arousing the sexual desires of either the perpetrator or the child." (*People v. Martinez* (1995) 11 Cal.4th 434, 452.)

Penal Code section 647.6, subdivision (a)(1) makes it a crime to "annoy[ ] or molest[ ] any child under 18 years of age." (Pen. Code, § 647.6, subd. (a)(1).)  Penal Code section 647.6 "does not require a touching [citation] but does require (1) conduct a ' "normal person would unhesitatingly be irritated by" ' [citations], and (2) conduct ' "motivated by an unnatural or abnormal sexual interest" ' in the victim."  (*People v. Lopez* (1998) 19 Cal.4th 282, 289.)

17

Penal Code section 11165.1 provides, "Conduct described as 'sexual assault' includes, but is not limited to" "[t]he intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of a child, or of the perpetrator of a child, for purposes of sexual arousal or gratification." (Pen. Code, § 11165.1, subd. (b)(4).) "The absence of physical evidence of sexual abuse does not preclude a finding of sexual abuse." (*In re L.O.* (2021) 67 Cal.App.5th 227, 241–242.)

"To determine whether a defendant acted with sexual intent, all the circumstances are examined. Relevant factors include the nature and manner of the touching, the defendant's extrajudicial statements, the relationship of the parties and 'any coercion, bribery or deceit used to obtain the victim's cooperation or avoid detection.' [Citation.] The requisite intent 'must be inferred from all the circumstances . . . . A touching which might appear sexual in context because of the identity of the perpetrator, the nature of the touching, or the absence of an innocent explanation, is more likely to produce a finding that the act was indeed committed for a sexual purpose and constituted a violation of the statute. On the other hand, if the trier of fact is persuaded . . . from all the circumstances, that the touching of a child was sexually motivated, nothing in the language, history, or purpose of [Penal Code] section 288 indicates that the touching should escape punishment simply because it might not be considered a means of sexual gratification by members of the mainstream population.' " (*In re R.C.* (2011) 196 Cal.App.4th 741, 750, italics omitted.)

18

3. <u>Analysis</u>

Mother, joined in by DCFS, asserts that the juvenile court erred in amending the section 300 petition to remove the allegation of sexual abuse, and in sustaining the petition as amended by interlineation. Mother and DCFS ask that we reverse the juvenile court's ruling and remand the case with directions to sustain the petition as originally pleaded.

We find that Mother and DCFS have not met the high burden required for a reversal.

In the underlying proceedings, DCFS was required to prove by a preponderance of the evidence that Ryan was a person described by section 300. (§ 355, subd. (a).) Here, the juvenile court found that DCFS failed to meet that burden under section 300, subdivision (d) (count d-1), and that it met the burden under section 300, subdivision (b)(1) (count b-1) only when the language in the petition was amended.

"[W]here the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals," the "question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellants' evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved of on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989.) Thus, the question before us is whether the juvenile court was compelled, as a matter of law, to sustain the petition as originally alleged under section 300(b)(1) and (d).

We find it was not.

When Father was interviewed by the CSW on December 4, 2023, he denied any incident where he laid on top of Ryan with an erection. Father said "nothing like that ever happened" and that he did "not recall anything like that at all." Father chalked up the incidents as rough-housing or goofing around. He admitted to having been "abused as a child" by his own father and reported he would "never do anything like that to his child." Father admitted to tickling Ryan near his upper thigh, where Ryan "is ticklish," but that it was while goofing around. Mr. Peraza, the therapist from Aurora Charter Oak, also opined that what triggered Ryan "may have been from playing around."

Ryan's forensic interview conducted on November 21, 2023 also contained notable inconsistencies. When Ryan first described the 2022 incident, he stated that Father was "just laying still on" Ryan for about two minutes until he got off and went outside to smoke. However, when the forensic interviewer asked clarifying questions, Ryan then said that Father's legs "were moving" and "shifting around" and that Father was "breathing heavily." As for the second incident, Ryan stated it took place sometime in December 2022 or January 2023, and later stated it took place "definitely right after Spring." He admitted it started off when Ryan was "messing" around with Father and "being annoying as a child does" when Father "plopped on top" of Ryan. When asked what Father did when he was on top of Ryan, Ryan answered, "He didn't really do anything." But a few minutes later, Ryan said Father's legs were "moving more than the last time" and "were shifting around a lot." Ryan didn't "know if it was just [Father's] pants or

something cause he had jeans on . . . but there was like something poking" him.

The juvenile court stated on the record that it "consider[ed] all of the factors and the people involved and the statements that were made by Ryan . . . through the forensic interview," which the juvenile court watched via DVD. The court found Ryan was very bonded and devoted to his Mother and "internalizes a lot of the mother's emotions and feelings with regards to the father." The court found "a lot of it stems from the gender dysphoria and lack of knowledge and information, and I think that the intensely emotional experience that Ryan has undergone because of the custody disputes and all of it has sort of blended together." The court did not "believe, even by a preponderance of the evidence, that any of the behaviors that Ryan attributes to the father were done for sexual gratification such that the elements in . . . Penal Code. . . section 11165.1 [are met]." The court did not think "that even the description of the potential erection that was discussed even meets that level." We defer to the trial court's credibility assessments based, as they are, on firsthand observations unavailable to us on appeal. (*People v. Williams* (2015) 61 Cal.4th 1244, 1262.)

Father's behavior towards Ryan was concerning. The crossing of certain boundaries was an appropriate basis for jurisdiction over Ryan under section 300, subdivision (b)(1). However, the evidence presented does not *compel* a finding of sexual abuse as a matter of law, in part because it does not support a finding that Father had the requisite sexual intent. Mother's and DCFS's evidence (i.e., that Ryan felt Father's erection during the incidents) was not uncontradicted and

21

unimpeached so as to compel a finding that Father sexually abused Ryan.

Mother contends the juvenile court's finding that the crossing of boundaries did not amount to sexual abuse is contradicted by another finding by the juvenile court that Ryan was credible in his recounting of the two incidents (which would include Ryan's allegation that he felt Father's erect penis). We agree that the juvenile court's statements were contradictory at times, but confusing statements do not meet the high appellate burden applicable here. If Ryan's statements were the only evidence before the court, and his version of events was uncontradicted and unimpeached, a different result might be warranted. But because Father's interview contradicted Ryan's account, we cannot find that the evidence compelled, as a matter of law, a finding of jurisdiction under the petition as originally phrased.

Applying these principles, we conclude that the evidence, "view[ed] . . . in the light most favorable to the juvenile court's determinations" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992), is sufficient to support the finding that Father did not act with the requisite sexual intent set forth in Penal Code sections 11165.1, subdivision (b)(4), 288, subdivision (a), and 647.6, subdivision (a)(1). The juvenile court here could properly conclude that while Father did not recognize appropriate boundaries with Ryan, he did not act with the requisite sexual intent. We therefore decline Mother's and DCFS's request to reverse the findings and remand the cause and we affirm the juvenile court.

## DISPOSITION

The juvenile court's findings and order made March 28, 2024 are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

WILEY, J.

VIRAMONTES, J.